IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BLY & SONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL NO. 05-668-GPM |
| | ) |
| ETHAN ALLEN INTERIORS, INC., | ) |
| ETHAN ALLEN RETAIL, INC., f/k/a Ethan | ) |
| Allen, Inc., ETHAN ALLEN GLOBAL, | ) |
| INC., and M. FAROOQ KATHWARI, | ) |
| | ) |
| Defendants. | ) |

# **MEMORANDUM AND ORDER**

**MURPHY, Chief District Judge:**

This matter came before the Court on August 14, 2006, for a hearing on Defendants' motion for summary judgment and Plaintiff's motion to reconsider the Court's January 1, 2006, Memorandum and Order granting partial summary judgment. For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiff's motion to reconsider is denied.

This case involves a License Agreement signed in 1992 granting Plaintiff the right to sell Ethan Allen brand home furnishings and accessories at its three stores in the St. Louis metropolitan area.[1] The contract provides:

> This Agreement and the attachments hereto, sets forth the entire agreement

---

[1] Plaintiff's store in Fairview Heights, Illinois, opened in 1978; the store in Chesterfield, Missouri, opened in 1986 and closed in 2006; and the store in Kirkwood, Missouri, opened in 1998.

> and understanding between the parties relating in any way to the use of the MARKS and supersedes all prior agreements or understandings respecting the same. LICENSOR makes no representations except those specifically set forth herein. This Agreement may not be amended or modified except by a written instrument which is signified by both parties.

(Doc. 58, Ex. A, ¶ 9.) Plaintiff argues that this provision does not govern such things as pricing, store appearance, delivery, product returns, support staff, and store operation, and that these things are governed by other agreements, specifically a series of contracts, which Defendants have breached. Plaintiff argues that the parties' relationship is governed by two contracts: an oral contract based on the parties' course of dealing and longstanding business relationship and the License Agreement governing the use of marks, which only applies to tagging and displaying the Ethan Allen logo. Defendants contend that the above-quoted provision in the License Agreement encompasses all of the items raised by Plaintiff, as they all relate to Ethan Allen's trademark. Defendants propose that the only terms of their relationship with Plaintiff that are not governed by the License Agreement are the buyer-seller transactions that occur every day as Plaintiff buys inventory from Defendants. Both sides agree that the License Agreement is not ambiguous.

      The basis of this action and procedural history thus far are set forth in the Court's January 19, 2006, Memorandum and Order. The parties make much of the facts of this case, going back many, many years. But this case currently is before the Court on a motion for summary judgment. If Defendants' are entitled to summary judgment, there can be no genuine issue as to any material fact. The standard applied to summary judgment motions filed under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows.

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material

> fact exists, [the court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. The evidence must create more than some metaphysical doubt as to the material facts. A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (internal citations and quotations omitted). Because the legal issues presented are relatively narrow, the Court will set forth further facts only as necessary in its analysis.

Plaintiff's Motion to Reconsider

Plaintiff asks the Court to reconsider its January 19th Order granting Defendants partial summary judgment on Plaintiff's Illinois Franchise Disclosure Act (IFDA) claim and limiting damages thereon, if any, to costs and attorney fees incurred from September 3, 2005, to September 29, 2005, the time between which the termination letter was sent and rescinded.[2] Plaintiff relies upon testimony given by newly-added Defendant M. Farooq Kathwari, Chairman of the Board, Chief Executive Officer, and President of Ethan Allen Interiors, Inc., and Ethan Allen Global, Inc. Plaintiff contends:

> Ethan Allen has misled this Court in a cynical effort to defeat Bly & Sons' claims and deny Bly & Sons its day in court. It is clear that Ethan Allen has continued its efforts to terminate Bly & Sons' franchise and drive it out of business. In light of this evidence, Bly & Sons is entitled to bring its full IFDA claim before a jury and allow the jury to decide if its franchise has indeed been wrongfully terminated. The Court should, therefore, reconsider and reverse its earlier ruling limiting the scope of Bly & Sons' IFDA claim.

---

[2] While there is no paper called a "motion to reconsider" in the Federal Rules of Civil Procedure, courts generally construe such requests as being brought under Rule 59(e) or Rule 60(b). *Walker v. Abbott Labs.*, 340 F.3d 471, 475 n.2 (7th Cir. 2003).

(Doc. 64, p. 3.) The Court has considered this argument twice before, and the simple answer is this. Having considered all of the evidence cited by Plaintiff, what difference does it make? As stated in the January 19th Order, if Plaintiff had a franchise before the termination letter was sent, a question which is answered below, it had one after the letter was rescinded. Eric Bly, President of Bly & Sons, Inc., testified that after September 29th, Ethan Allen did nothing to enforce the termination of the License Agreement (Doc. 70, Ex. A at 60:23 through 61:2). He further confirmed that there is "no dispute that Ethan Allen continued to ship [his] furniture, subject to the $200,000 credit limit, after September 29, and [he] continued to hold [himself] out as an Ethan Allen dealer" (*Id.* at 68:1-6). The parties agree that the issue of whether a claim for constructive termination exists under the IFDA is a matter of first impression in this Circuit, and this Court is unwilling to recognize such a claim when it is raised for the first time in a motion to reconsider.[3] *See Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (a motion for reconsideration should not serve as the occasion to tender new legal theories for the first time). Plaintiff's motion to reconsider (Doc. 63) is **DENIED**.

Illinois Franchise Disclosure Act Claim

Plaintiff claims that Defendants violated the provision of the IFDA that provides that a franchisor may not terminate a franchise prior to the expiration of its term except for "good cause" as defined in the Act. *See* 815 ILCS 705/19. Plaintiff further claims that M. Farooq Kathwari, as the principal executive officer of the Ethan Allen entities, materially aided Defendants' violation of the IFDA and is, therefore, jointly and severally liable for such violation. *See* 815 ILCS 705/26.

---

[3] Both the original and amended complaints state: "On September 3, 2005, Ethan Allen terminated Bly & Sons' franchise." (Doc. 2, ¶ 87; Doc. 51, ¶ 86.)

Defendants seek summary judgment on this claim on the premise that Plaintiff cannot show all of the elements to establish a franchise such that the IFDA would apply.[4]  Specifically, Defendants contend that Plaintiff never was required to pay anything that could be considered a franchise fee. *See* 815 ILCS 705/3(1), (14).

It is difficult to see how the mandatory contribution of 2% of a licensee's invoices to an advertising fund that was required of all licensees does not constitute a franchise fee.  While it was paid in the mid-1990s, nothing in the IFDA states that it must be paid annually.  *See To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 662 (7th Cir. 1998) (the sum of $500 is "all that has to be paid over the entire life of a franchise").  Moreover, Plaintiff submitted the declaration of Eric Bly stating that this payment was charged and collected by Ethan Allen and that the 2% amount far exceeded the threshold $500 required by the statute (Doc. 65, ¶ 53).  The Court rejects Defendants' argument that they did not receive the payment; rather, the advertising agency did.  Ethan Allen directed payment of the fee, and who received it was merely an accounting function.  Moreover, Eric Bly states that Ethan Allen collected the money.  The advertising payment constitutes an indirect franchise fee under the Act.  *See To-Am*, 152 F.3d at 662-63 (distributor's

---

[4]The IFDA provides:
"Franchise" means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:
    (a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and
    (b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
    (c) the person granted the right to engage in such business is required to pay, directly or indirectly, a franchise fee of $500 or more."
815 ILCS 705/3(1).

required payments for service and parts manuals constituted an indirect franchise fee).

Although Defendants did not brief the issue, during the hearing counsel argued that the advertising payments cannot be considered a franchise fee under the statute because they were not paid for the right to enter the business and sell goods. The defendant in *To-Am* made a similar argument, relying on Illinois Administrative Code § 200.105(a), which provides: "Any payment(s) in excess of $500 that is required to be paid by a franchisee to the franchisor or an affiliate of the franchisor constitutes a franchise fee unless specifically excluded by Section 3(14) of the Act." The Court in *To-Am* responded:

> What the regulation does is to make clear that a payment for the right to enter a business may be collected over a period of years, need not be definite in amount, and may be indirect. Nothing in the Illinois Franchise Disclosure Act insists that all franchise fees must be paid up front, or not at all. The obligation to pay the indirect fees is contained in the initial dealership agreement here, which supports the district court's conclusion that a jury reasonably could regard the payments as compensation for the right to become a dealer.

152 F.3d at 664. While the facts presented here are slightly different, as the advertising fee is not set out in the License Agreement, the Court construes the payment that was initiated sometime after the License Agreement was signed as compensation for the right to *continue* as a dealer. It is one thing, as Defendants suggest, for Plaintiff to incur some advertising expenses as an ordinary business expense; it is another for Ethan Allen to require its dealers to pay a percentage of their invoices into a common advertising fund. The Court rejects Defendants' argument on this basis, as well.

Having found payment of an indirect franchise fee, the other elements of a franchise do not appear to be, and cannot seriously be, in dispute. The License Agreement provides: "LICENSEE agrees to abide by LICENSOR's quality standards, as those standards may be amended by LICENSOR from time to time." (Doc. 58, Ex. A at ¶ 2.) Defendants concede that Ethan Allen's

quality standard are reflected in the Standards of Operation manual, which is attached as Exhibit B to their motion. Additionally, the September 3rd termination letter states: "we fully expect that you will continue to abide by the Standards of Operation and all other requirements of your license agreement" (Doc. 58, Ex. U).[5] Therefore, the Court finds that a franchise relationship existed on September 3, 2005. It is clear that on September 3, 2005, a termination letter was sent, and it does not state any good cause for termination (*see* Doc. 58, Ex. U).[6] Although Plaintiff has not sought summary judgment, most likely because it seeks reconsideration of the Court's earlier Order, no triable issue remains on this claim, and the Court finds that Defendants terminated Plaintiff's franchise without cause in violation of Section 19 of the IFDA. Accordingly, Plaintiff shall submit its costs and attorney fees incurred from September 3, 2005, through September 29, 2005, related to the termination of the License Agreement. These costs and fees are limited, however, to those incurred on behalf of Plaintiff's Illinois store only. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 385 (7th Cir. 2003) (examining choice of law provisions providing that dealership contracts were governed by Illinois law where the dealers were all located outside of Illinois and holding that the "IFDA is a provision of Illinois law but, by its own terms, the IFDA applies only to franchises located within the State of Illinois"); *see also Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 380 (7th Cir. 1998) (finding that the distributor plaintiff could not make a claim based on the Wisconsin Fair Dealership Law for lost profits arising out of the termination of its out-of-state dealerships); *American Top English, Inc. v. Lexicon Mktg. (USA), Inc.*, No. 03 C 7021, 2004

---

[5] While the letter is dated September 2, 2005, the parties agree that it was sent and received, via facsimile, on September 3rd.

[6] The Court additionally has examined the provision of the IFDA governing nonrenewal of franchises and finds it inapplicable. *See* 815 ILCS 705/20.

WL 1403695, at *4 (N.D. Ill. June 21, 2004), *quoting H.R.R. Zimmerman Co. v. Tecumseh Prods. Co.*, No. 99 C 5437, 2002 WL 31018302, at *4 (N.D. Ill. Sept. 9, 2002) (examining the extraterritorial limits of the IFDA and reiterating that "this court will not impose 'the public policy choices of the Illinois legislature … [on] the consumers of [other states]. The IFDA does not apply to sales to out-of-state customers."); *cf. To-Am*, 152 F.3d at 662 (noting that the parties did not address "the possible significance of the fact that some portion of To-Am's territory was in Indiana," and, therefore, declining to address it). Plaintiff's argument that this rule should not be applied because all of its sales were made through its general offices in Illinois is unpersuasive. Plaintiff's submission of costs and fees is due **on or before September 22, 2006**, and Defendants shall file any objections thereto **on or before October 6, 2006**.

Breach of Contract

Although Plaintiff entitles Count II as a claim for "Violation of the Implied Covenant of Good Faith and Fair Dealing by Ethan Allen" and cites to the Illinois Uniform Commercial Code (U.C.C.), for the reasons set forth in the January 19th Order, such a claim cannot stand.[7] Also as set forth in that Order, the Court construes Plaintiff's allegations as a common law breach of contract claim, and the parties have so briefed the issue. Plaintiff argues that although the implied covenant of good faith and fair dealing cannot serve as an independent basis for a breach of contract claim, it does require "'a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties.'" (Doc. 65, *quoting Cromeens*, 349 F.3d at 395.) As set forth above, Plaintiff argues that the course of dealing between the parties and standard industry practices created obligations on the part of Defendants with respect to

---

[7]Curiously, Plaintiff realleged this claim as such in the amended complaint.

advertising, pricing, and management of warranty claims. Its theory continues that under the implied covenant of good faith and fair dealing, Defendants breached their obligations by exercising their discretion in bad faith. Plaintiff further contends that Defendants' handling of a warranty dispute by terminating and subsequently limiting Plaintiff's credit was undertaken in bad faith and, therefore, a breach under the contract.[8] Plaintiff's chief complaint, as set forth in its brief opposing summary judgment, is Defendants' adoption of a new pricing model entitled "Everyday Best Pricing" (EDBP) and Defendants' failure to provide advertising to promote the new price model. Plaintiff argues:

> There certainly exists a question of fact as to whether or not the course of dealing between the parties and standard industry practices created obligations on the part of Ethan Allen not to precipitately abandon its longstanding pricing model, certainly at a time when it was not providing its traditional level of advertising support for the brand.
>
> Even if Ethan Allen has wide discretion on matters such as pricing and advertising, it is not unfettered discretion. Where a party has discretion under a contract, it is still bound by the implied covenant of good faith and fair dealing. There is substantial evidence that Ethan Allen intended to harm its franchisees using the pretext of EDBP to conceal a decision not to support franchisee sales events.

(Doc. 65, p. 16.)

Defendants seek summary judgment on the basis that the applicable contract is the License Agreement, and the License Agreement imposes no duties upon Defendants with respect to these issues about which Plaintiff complains. Plaintiff's theory, while appealing considering how long the parties' relationship continued, has several flaws. First, Plaintiff cannot articulate the *terms* of the purported oral contract that Defendants allegedly breached. Second, even if the Court accepts Plaintiff's argument that an oral contract existed based upon the course of dealing before and after

---

[8] This involved Plaintiff's acknowledged improper credit requests for warranty repairs.

the signing of the License Agreement in 1992, Paragraph 9 unambiguously states that the Agreement sets forth the entire agreement and understanding of the parties relating in any way to the use of the marks; that it supersedes all prior agreements or understandings respecting the use of the marks; that Licensor makes no representations other than those contained in the Agreement; and that the Agreement may not be amended or modified except in writing signed by both parties. This gets the Court back to Defendants' argument set forth above - that the Agreement covers all areas about which Plaintiff complains but does not impose an obligation upon Defendants with respect to pricing, advertising, warranty claims, or credit.

Plaintiff's argument regarding the implied covenant of good faith and fair dealing does not help it, as there must be a contract in the first instance. "Every contract contains an implied promise of good faith and fair dealing between the contracting parties." *Cromeens*, 349 F.3d at 395. Plaintiff is correct that the covenant requires that a party given broad discretion in performing under a contract act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties. *Id*. However, "Illinois courts use the covenant to determine the intent of the parties where a contract is susceptible to two conflicting constructions. This is not such a case." *Id*. (internal citation omitted). The License Agreement is not ambiguous. It clearly states: "LICENSEE agrees to abide by LICENSOR's quality standards, as those standards may be amended by LICENSOR from time to time." (Doc. 58, Ex. A at ¶ 2.) The quality standards are contained in the Standards of Operation, which the evidence shows are amended from time to time as provided in the License Agreement. The cover letter attached to the current version dated October 2000 states:[9] "For our mutual understanding, standards consist of the following, and should be uniformly

---

[9]This letter was signed by M. Farooq Kathwari.

applied throughout the entire family of Ethan Allen stores: Standard of Display[;] Standard of Advertising[;] Standard of Merchandising[;] Standard of Training[;] Standard of Customer Service[;] Standard of Corporate Identity and Signage[;] Standard of Exclusivity[;] Standard of Communication and Reporting." (Doc. 58, Ex. B.) These standards clearly relate to use of the marks and are governed by the License Agreement, and the parties agreed in the License Agreement that the standards may be amended by Licensor. Defendants did not breach the License Agreement by amending the quality standards. *See Cromeens*, 349 F.3d at 394 ("A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it."). Finally, Defendants never agreed to be bound to the pre-EDBP model of pricing. Plaintiff's breach of contract claim fails as a matter of law.

<u>Open Price Term Provision</u>

Count III relates to what the parties and the Court have called the "buyer-seller relationship." It is brought under the provision of the Illinois U.C.C. that provides where the price for goods is to be fixed by one party, the price so fixed must be fixed in good faith. 810 ILCS 5/2-305(2). Plaintiff claims that Defendants were vested with the discretion for setting the wholesale prices at which Plaintiff purchased furniture, that Defendants did not set the wholesale prices in good faith, and that Plaintiff paid commercially unreasonable prices for goods purchased from Defendants in breach of the buyer-seller contract and in violation of the Illinois U.C.C.

The Illinois U.C.C. requires timely notice of breach. 810 ILCS 5/2-607; 810 ILCS 5/2-714. A buyer who fails to give such notice will be barred from any remedy. *Id*. at § 607. Defendants argue that Plaintiff's acceptance of the allegedly overpriced goods qualifies as acceptance of non-

conforming goods under the Illinois U.C.C.  Plaintiff responds that it "had a suspicion that it was being charged unreasonable wholesale prices, but had no evidence and thus no basis to complain to Ethan Allen and jeopardize its franchise.  It was not until discovery was obtained in this action that Bly & Sons found that Ethan Allen was hiding the discriminatory nature of the wholesale prices it charged by keeping prices the same for franchisees and Company-owned stores, but ensuring that Company-owned stores received far greater support for their selling efforts" (Doc. 65, pp. 19-20).  This argument is nonsensical.  If Plaintiff did not know about the unreasonableness and discriminatory nature of the wholesale prices until discovery was obtained in this action, what was the basis for filing the claim as part of the original complaint in the first instance?  Plaintiff makes no argument as to why the notice requirement should not apply to excessive pricing as a non-conforming good.  Therefore, the Court accepts Defendants' argument and finds persuasive the analysis set forth in *Dixie Gas & Food, Inc. v. Shell Oil Company*, No. 03 C 8210, 2005 WL 1273273, at *6 (N.D. Ill. May 25, 2005).  Defendants are entitled to judgment as a matter of law on Plaintiff's claim under the open price term provision of the Illinois U.C.C. because Plaintiff failed to give Defendants notice of the breach as required under the U.C.C.

Conclusion

For the reasons set forth herein, Defendants' motion for summary judgment (Doc. 58) is **GRANTED in part and DENIED in part**.  Plaintiff is **ORDERED** to submit its costs and attorney fees incurred on behalf of Plaintiff's Illinois store only from September 3, 2005, through September 29, 2005, **on or before September 22, 2006**.  Defendants shall file any objections thereto **on or before October 6, 2006**.  Plaintiff's motion to reconsider (Doc. 63) is **DENIED**.  The trial scheduled for September 12, 2006, is **cancelled**.  After resolution of Plaintiff's costs and fees under

the IFDA, this action will be dismissed with prejudice, and judgment will be entered accordingly.

**IT IS SO ORDERED.**

DATED: 09/01/06

                                                  s/ *G. Patrick Murphy*
G. PATRICK MURPHY
Chief United States District Judge